Dear Representatives Bastin,
¶ 0 This office has received your request for an Attorney General Opinion, in which you ask the following questions:
1. Was it the intent of the Legislature, in enacting theprovisions of 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14], which authorizethe Governor to implement a "freeze in hiring," to have suchfreeze apply to the State Insurance Fund, created at 85 O.S.1991. § 131?
2. Do the provisions of 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14], whichauthorize the Governor to implement a freeze in hiring, alsoempower the Governor to declare and implement a freeze onentering into professional or personal service contracts?
 I. PERSONNEL ACT'S "FREEZE IN HIRING" Intent And Applicability Of "Freeze In Hiring" Provision
¶ 1 To determine the Legislature's intent in enacting the provisions of 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14], we must look to the language used in enacting the statute as "[t]he cardinal rule for construction of statutes is to ascertain the intent of the legislature by consideration of the statutory language." GrandRiver Dam Authority v. State, 645 P.2d 1011, 1018 (Okla. 1982).
¶ 2 The general intent of the Legislature in enacting the provision you inquire about, 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14], was articulated in subsection A:
 The intent of the Legislature is to increase
individual agency skill and accountability in managing the costs associated with personnel and in applying controls that will enhance the ability of the State of Oklahoma to manage the overall costs of human resources as efficiently as possible, while continuing to maintain fairness to employees.
74 O.S.Supp. 1994, § 840-2.14[74-840-2.14](A) (emphasis added).
¶ 3 The next two subsections of 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14]
require "[a]ll agencies, boards and commissions" to report all employee reallocation decisions, all adjustments to pay grade, salary adjustments, and all transactions involving the establishment of new positions not specifically authorized by legislation:
 B. All agencies, boards, and commissions shall report all reallocation decisions for both classified and unclassified positions and all adjustments to pay grades or salary assignments for classes in the unclassified service to the Office of Personnel Management on a quarterly basis. The Office of Personnel Management shall submit the quarterly reports to the Governor, the President Pro Tempore of the Senate, and the Speaker of the House of Representatives, along with an analysis of statewide reallocation decisions.
 C. All agencies, boards and commissions shall report to the Office of Personnel Management on a quarterly basis all transactions in both the classified and unclassified service involving the establishment of new positions that have not been authorized specifically by legislative action. The Office of Personnel Management shall forward the quarterly reports to the Governor, President Pro Tempore of the Senate, and Speaker of the House of Representatives, accompanied by an analysis of agency decisions concerning such positions.
74 O.S.Supp. 1994, § 840-2.14[74-840-2.14] (emphasis added).
¶ 4 The freeze in hiring you inquire about is provided for in subsection D of Section 840-2.14. In providing for the applicability of such a freeze, the Legislature specifically exempted the University Hospitals Authority, including all hospitals or other institutions operated by the Authority, from the provisions of subsection D:
 As a further control on human resource costs, the Governor may declare a financial emergency or implement a freeze in hiring, by declaring this section to be in effect, provided, however, the University Hospitals Authority, including all hospitals or other institutions operated by the University Hospitals Authority, shall not be subject to the provisions of this subsection.
74 O.S.Supp. 1994, § 840-2.14[74-840-2.14](D) (emphasis added).
¶ 5 A reading of the language of the section as a whole makes it clear that it was the intent of the Legislature that the hiring freeze provisions apply to all State "agencies, boards and commissions," with the exception of the University Hospitals Authority, "including all hospitals or other institutions operated by" that authority. The term "agency" as used in the Oklahoma Personnel Act, of which Section 840-2.14 is a part, is defined at 74 O.S.Supp. 1994, § 840-1.3[74-840-1.3](1), which provides:
 "Agency" means any office, department, board, commission or institution of the executive branch of state government[.]
¶ 6 To determine whether the provisions of 74 O.S.Supp. 1994,§ 840-2.14[74-840-2.14] and the hiring freeze provided for in that statute, apply to the State Insurance Fund, we must determine whether the Fund is an "agency" as defined above. If the Fund is an "agency" as defined, the statute and its hiring freeze apply to the Fund.
 General Nature Of The State Insurance Fund
¶ 7 As the Oklahoma Supreme Court noted in Moran v. State exrel. Derryberry, 534 P.2d 1282, 1284 (Okla. 1975), the State Insurance Fund ("the Fund") was created by an act of the Legislature in 1933 (Okla. Sess. Laws 1933, ch. 28). The Fund, as described by the Supreme Court, "was created during the Great Depression to satisfy the need for Workmen's Compensation insurance for companies unable to procure coverage from private insurance companies and for employers in high risk industries." The statute creating the Fund in its present form, 85 O.S. 1991,§ 131[85-131], specifies the purpose of the Fund in the following language:
 There is hereby created and established a fund to be known as "The State Insurance Fund", to be administered by the State Insurance Fund Commissioner, without liability on the part of the state beyond the amount of said fund, for the purpose of insuring employers against liability for compensation under Sections 131 through 151 of this title, and for assuring for the persons entitled thereto compensation provided by the workers' compensation law, and for the further purpose of insuring persons, firms and corporations against loss, expense or liability by reason of bodily injury, death by accident, occupational disability, or occupational disease suffered by employees, for which the insured may be liable or have assumed liability. Said fund may further provide insurance for employers against liability incurred as the result of injuries sustained by employees engaged in employment subject to the Longshoremen's and Harbor Workers' Compensation Act as enacted or as may be amended by the Congress of the United States.
85 O.S. 1991, § 131[85-131].
¶ 8 In its three subsections, the provisions of 85 O.S. 1991,§ 131[85-131] describe the Fund in more detail, providing that it is a revolving fund consisting of premiums, interest and other assets, and that the Fund may be used to both pay losses sustained on account of insurance policies sold, and to pay the expenses of the Fund. Further, subsection (c) of Section 131 provides that the Fund is to be competitive with other insurance companies, but never more than self-supporting. The Fund is managed by a Board of Managers who shall have "supervision over the administration and operation" of the Fund. 85 O.S. 1991, § 131a[85-131a](A). In addition to one member appointed by the Governor, two members appointed by the Speaker of the House of Representatives, and two members appointed by the President Pro Tempore of the Senate, the following State officials, or their designees, serve as members of the Board of Managers: the Director of State Finance, the Lieutenant Governor and the State Auditor and Inspector. Id.
The Director of Central Purchasing of the Office of Public Affairs also serves on the board, but does not have the power to have a designee serve in his or her stead. Id.
¶ 9 Under the provisions of 85 O.S. 1991, § 131b[85-131b], the Board of Managers of the State Insurance Fund is required to appoint a Fund Commissioner who "shall be the executive manager" of the Fund. The Commissioner is vested with "full power, authority or jurisdiction" over the Fund. The Commissioner is to perform any duties which are necessary or convenient in the exercise of that power, authority or jurisdiction, or in connection with the insurance business to be carried on by the Fund "as fully and completely as a governing body of a private insurance carrier might or could do including the acquisition, operation and maintenance of an electronic data processing facility." 85 O.S.1991, § 132[85-132].
¶ 10 The Commissioner's powers include the full power and authority to "manage and conduct all business and affairs relating" to the Fund. 85 O.S. 1991, § 133[85-133]. The affairs of the Fund, conducted by the Commissioner, are to be carried out "under the name of the State Insurance Fund." The Commissioner is vested with the power to sue and be sued in the name of the Fund, make and enter into contracts of insurance on behalf of the Fund, and invest and reinvest the Fund's monies.
¶ 11 All receipts of money, with the exception of investment income, are to be deposited into the State Insurance Fund fund in the State Treasury, and monies used for investment purposes may be transferred from the State Treasury to the custodian bank or trust company of the Fund. 85 O.S. 1991, § 135[85-135](A).
¶ 12 The statutes impose a limit on the amount of monies in the Fund that may be used for the expenses of running the Fund's business. This limit is contained in 85 O.S. 1991, § 136[85-136](A), which in pertinent part reads:
 The Commissioner shall appoint, with the approval of the Board of Managers of the State Insurance Fund, such assistants, accountants, claim adjusters, and other employees as may be necessary to conduct the business and carry out the provisions of Section 131 et seq. of this title, or to perform the duties imposed upon him by this act; provided, that in no event shall the salaries of such employees, together with all other expenses of said fund, exceed twenty percent (20%) of the earned premiums. . . .
85 O.S. 1991, § 136[85-136](A) (emphasis added).
¶ 13 We thus see from the statutes creating the State Insurance Fund, that it has attributes of both a private business and a State agency.
 Court's View Of The State Insurance Fund As, On The One Hand, A Department, Agency And Instrumentality Of The State, And On The Other Hand, An Insurance Company
¶ 14 A few years after the Fund was created, the Oklahoma Supreme Court, in O.K. Const. Co. v. Burwell, 93 P.2d 1092
(Okla. 1939), was for the first time called upon to determine the nature of the State Insurance Fund. The issue in the Burwell
case was whether the State Insurance Fund was relieved of the responsibility of filing an appeal bond by virtue of a statute which provided that whenever an action was filed in any court "by the State of Oklahoma, or by direction of any department of the State," no bond was required. Id. at 1093.
¶ 15 Holding that the State Insurance Fund was a department ofthe State and thus not required to post an appeal bond, the Supreme Court stated:
 It is observed that no legislative, judicial or governmental functions are authorized by the terms of the Act, but the powers granted are administrative in character and may be terminated at any time at the will of the Legislature. The powers and duties are exercised by elected and appointed state officers
who perform said functions without added compensation. We are not here dealing with an independent corporate entity or a governmental agency created by law and vested with a measure of governmental power, but a mere department created for a fixed and limited purpose, over which the State, through its legislature and its officials retains absolute domination and control. The State Insurance Fund, therefore, is a department of the State of Oklahoma within the meaning of that term as used in Section 514, supra, and is not required to give an appeal bond.
Burwell, 93 P.2d at 1094 (emphasis added).
¶ 16 In 1954 the Oklahoma Supreme Court held that the State Insurance Fund was protected by the State's sovereign immunity inState v. District Court of Oklahoma County, 278 P.2d 841 (Okla. 1954). In that case the Court in its first syllabus, held that the Fund was a department of the State created for a public purpose:
 The State Insurance Fund is a department of the State of Oklahoma, administered by state officials, and created for the public purpose of insuring employers against liability for compensation under the Workmen's Compensation Act and against liability by reason of bodily injury, death by accident or occupational disease suffered by employees and for assuring for the persons entitled thereto compensation provided by said act. As a department of the State it is not liable in a civil action for damages for the tort of one of its officers or employees.
278 P.2d at 841 (emphasis added).
¶ 17 In 1958, in State Insurance Fund v. Taron, 333 P.2d 508
(Okla. 1958), the Fund attempted to bring an indemnity action, and in doing so, argued that because the Fund is a department of the State of Oklahoma, the statute of limitations did not run against it. Rejecting this argument, the Court held that while the general rule is that the statute of limitations does not apply to the State when engaged in a sovereign capacity, the rule is otherwise when the State goes into business in concert, or in competition with, individuals, or when a suit in its name or for its benefit concerns private, as distinguished from public, rights. Taron, 333 P.2d at 513.
¶ 18 Concluding, the Court found that the action brought by the Fund rose out of the management and administration of its insurance business, and that, "[t]he statutes of limitations therefore apply to it to the same extent as to any other private insurance carrier." Taron, 333 P.2d at 513.
¶ 19 Less than a year later, the Oklahoma Supreme Court, inState v. Bone, 344 P.2d 562 (Okla. 1959), had occasion to further look at the nature of the State Insurance Fund. InBone, a tort action arising out of an automobile collision was brought against the Fund and the Court was asked to reconsider its holding that tort actions against the Fund were barred by sovereign immunity.
¶ 20 After once again examining the nature of the Fund, the Court concluded that the Fund was not protected by traditional sovereign immunity. So holding, the Court overruled a prior holding in State v. District Court of Oklahoma County,278 P.2d 841 (Okla. 1954), to the extent the prior opinion could be understood to extend the State's immunity to a State agency's performance of a non-governmental function. In addressing the issue, the Bone Court noted that under the provisions of Title 85, Sections 132 and 133, the Fund's Commissioner is vested with the full power, authority and jurisdiction over the Fund's insurance business, and shall perform any duties "which are necessary or convenient in the exercise of any power, authority, or jurisdiction over such Fund in the administration thereof, or in connection with the insurance business to be carried on by him," under the provisions of the act "as fully and completelyas a governing body of a private insurance carrier might or coulddo." Bone, 344 P.2d at 567-568. Concluding that immunity did not protect the Fund from suit, the Bone Court relied on both the Fund's managerial independence and its financial independence. Yet, in so ruling the Court recognized that the Fund was an "agency or instrumentality of the State." Id. at 568.
¶ 21 These decisions of the Supreme Court touch on the dual nature of the State Insurance Fund. The Court in these opinions recognized that on one hand, the Fund is a "department," "agency" or "instrumentality" of the State, and on the other hand, performs a purely business function — that of running a workers' compensation insurance company.
¶ 22 In 1975, when the Legislature attempted to appropriate monies out of the Fund for general governmental uses, the Court had occasion to take yet a further look at the nature of the Fund when the constitutionality of the act, which attempted to appropriate money from the Fund, was challenged in Moran v.State ex rel. Derryberry, 534 P.2d 1282 (Okla. 1975). InMoran, an action was brought by policy holders of the State Insurance Fund seeking to enjoin the statutorily directed liquidation of certain assets of the Fund. The statute in question sought to take and appropriate monies that were excess and surplus to the Fund. Finding that, as a matter of fact, there were no surplus funds, the trial court held that accordingly the removal of such monies from the Fund would, also as a matter of fact, impair the Fund's policyholders' contract rights. Thus the trial court found the challenged legislation unconstitutional. The State Supreme Court affirmed, ruling that the challenged act unconstitutionally impaired insurance contract rights of the Fund's policyholders. Of course, whether a legislative enactment impairs a contract is a fact intensive inquiry. Thus, we express no opinion on whether implementation of a "freeze in hiring" under 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14] would impair any existing contract rights.
¶ 23 In discussing the "legal status" of the Fund, the Moran
Court relied on the holdings in State v. Bone, 344 P.2d 562
(Okla. 1959), and cited with approval from its holdings in Bone
as follows:
Therein we stated at page 568:
 "* * * * Under no circumstances can the general funds of the State be reached in order to satisfy an obligation of the Fund. Independent control exists
in the Fund to operate and maintain an insurance company in the same manner as may be done by any privately owned insurance company. These factors permit it (the Fund) to be regarded as an independent business enterprise or entity."
And on page 569:
 "* * * * we now hold that the State Insurance Fund is a business enterprise as distinguished from purely governmental activities, and tort liability attaches and may be adjudicated pursuant to the consent statute, Sec. 133, 85 O.S. 1951, supra. In creating and undertaking the operation of the State Insurance Fund, it is reasonable to think that the same responsibilities were intended to be assumed as ordinary insurance companies are obliged to assume."
 [2] These statements i.e., "Independent Control," and "operate and maintain in the same manner as privately owned insurance company," and "independent business," and "a business enterprise as distinguished from purely governmental activities," when joined with the legislative injunction" that said Fund shall become neither more nor less than self-supporting." (§ 131, supra), compel the conclusion that the Legislature did not intend for the State to gain a pecuniary profit from the operation, nor to gain by reason of an unexpected "windfall" in the nature of an alleged surplus or excess reserve. . . .
Moran, 534 P.2d at 1286 (emphasis added).
¶ 24 In concluding that the State Insurance Fund monies were not State funds subject to appropriation, the Moran Court concluded the monies in the Fund were trust funds to be held for the benefit of employers and employees who have rights under insurance policies issued by the Fund:
 It is our conclusion the funds of the State Insurance Fund are not State funds and do not belong to the State, that such funds are trust funds for the benefit of employers and employees, and are not available for the general or other purposes of the State, nor are they subject to appropriation by the Legislature for purposes other than those contemplated by the State Insurance Fund Act.
Moran, 534 P.2d at 1288 (emphasis added).
¶ 25 These rulings of the Oklahoma State Supreme Court demonstrate that the Court, while considering the Fund a department or agency of the State, understands that the State Insurance Fund also has attributes of a private company — a private insurance company.
 Attorney General Opinions Viewing The State Insurance Fund As An Agency Or Instrumentality Of The State
¶ 26 In spite of the fact that the Fund has many attributes of a private insurance company, the Attorney General, like the courts, has recognized that it is nevertheless a State entity, subject to statutory control by the State.
¶ 27 In Attorney General Opinion 63-119, the Attorney General was asked to determine whether it was constitutional for then Governor Nigh to place the employees of the State Insurance Fund under the protection of the State Merit System. After examining the statutory laws relating to the "Merit System of Personnel Administration" and the "State Personnel Board" set forth at 74O.S. 1961, §§ 801[74-801] to 839, the Attorney General concluded that it was within the Governor's power to bring the employees of the State Insurance Fund within the protection of the Merit System. So holding, the Attorney General first looked to the "general purpose" of the Merit System Act, set forth at Section 801 of Title 74. That section provided that the general purpose of the act was to establish a merit system for certain specified "departments and agencies" of the State, and:
 [T]o provide for the extension of the merit system to the employees of such other State agencies or departments as the Governor may direct by an Executive Order.
A.G. Opin. 63-119, p. 1.
¶ 28 Turning to the Merit System Act's definition section, the Attorney General quoted from Section 802 of Title 74, which more specifically addressed the Governor's power to add state "agencies" to the Merit System:
 The word agency as used in this Act is defined to mean any board, commission or institution of the State Government. The Governor of the State of Oklahoma, upon determining that the merit system of personnel administration with the rules and regulations adopted thereunder shall be required, is hereby empowered and authorized, at his discretion, by an Executive Order, to place any agency or department of the State Government, and the employees thereof, with exempt positions as stipulated by said order, under the merit system of personnel administration prescribed by this Act. . . .
A.G. Opin. 63-119, pp. 1-2.
¶ 29 In concluding that the Governor could constitutionally add employees of the State Insurance Fund to the State Merit System, the Attorney General found that the State Insurance Fund came within the Merit System Act's definition of "agency," noting that the Oklahoma Supreme Court in State Insurance Fund v. Bone,344 P.2d 562, 568 (Okla. 1959), had referred to the Fund as an "agency or instrumentality of the State."
¶ 30 More recently, in Attorney General Opinion 88-61,[1]
the Attorney General concluded that the State Insurance Fund was "a `state agency' for the purposes of the Oklahoma Central Purchasing Act, 74 O.S. 1981, §§ 85.1[74-85.1] et seq.," and was therefore subject to the requirements of that act. The provisions of the Oklahoma Central Purchasing Act expressly provide that "all activities of any state agency . . . relating to purchasing shall be under the direction of the Purchasing Division [of the Office of Public Affairs], except such acquisitions as are excluded by the Oklahoma Central Purchasing Act." A.G. Opin. 88-61, quoting from 74 O.S.Supp. 1987, § 85.3[74-85.3].
¶ 31 After noting the other provisions of the Act also spoke in terms of "every State agency" and purchases "by agencies of the State government," the Attorney General found that the key inquiry in the opinion was whether the Fund was a "state agency" for the purposes of the Central Purchasing Act. A.G. Opin. 88-61, p. 143. Turning to the Act's definition of "state agency," or "agency," the Attorney General found that the definition included "any office, officer, bureau, board, counsel, court, commission, institution, unit, division, body or house of the executive or judicial branches of the state government, whether elected or appointed, excluding only municipalities, counties and other governmental subdivisions of the state." A.G. Opin. 88-61, p. 143, quoting from 74 O.S.Supp. 1987, § 85.2[74-85.2]. The Attorney General concluded that the Fund came within the definition of "agency" as it was administered by a "board," the Board of Managers, and further concluded the Fund was in the executive branch of state government, citing Spivey v. State,104 P.2d 263 (Okla.Crim.App. 1940), which held:
 Officers that are neither judicial nor legislative necessarily belong to the executive department of government, and are "executive" or "administrative" officers; those terms being equivalent.
104 P.2d at 277, quoting with approval from Sheely v. People,129 P. 201 (Colo. 1913).
 Conclusion
¶ 32 After review of the above-discussed case law, statutory law, and Attorney General opinions, we conclude, as the Oklahoma courts have, that the State Insurance Fund has attributes of both a private insurance company and a State entity. We further conclude that the State Insurance Fund comes within the Oklahoma Personnel Act's definition of "agency" at 74 O.S.Supp. 1994, §840-1.3[74-840-1.3](1), as it is a "department . . . of the executive branch of state government."
¶ 33 Because the provisions of 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14], which authorize the Governor to implement a "freeze in hiring," are part of the Oklahoma Personnel Act, and because that Act defines "agency" to include "department[s]" of the State, id.
at § 840-1.3(1), such as the State Insurance Fund, and further because it was clearly the intent of the Legislature to have the provisions of 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14] applied to all "agencies" of the State, we conclude that the section's provisions, including its "freeze in hiring" provisions, apply to the State Insurance Fund.
 II. "FREEZE" ON CONTRACTING POWER
¶ 34 In your second question you ask whether, under the power vested in him by 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14] to implement a "freeze in hiring," the Governor is also empowered to implement a freeze on State agencies, boards and commissions entering into professional or personal service contracts.
¶ 35 While the provision of Article VI, § 8 of the Oklahoma Constitution requires the Governor to "cause the laws of the State to be faithfully executed," the Oklahoma Supreme Court has held that the constitutional provision does not vest the Governor with law-making power. In Russell Petroleum Co. v. Walker,19 P.2d 582 (Okla. 1933), constitutional challenges were made to executive orders issued by then Governor William H. Murray. Governor Murray had issued executive orders calling out the State Militia to take possession of oil wells to enforce laws relating to the prevention of waste. The executive orders attempted to stabilize the price of crude oil by limiting its production. The Court ruled that the executive orders had no force and effect, for "no order, proclamation, or decree of the Governor of the state, as the chief executive thereof, has the force of law; the lawmaking power of the state being vested exclusively elsewhere."Id. at 587.
¶ 36 As the Attorney General opined in Opinion 77-191, "[t]he Governor has no prerogative powers, but possesses only such powers and duties as are vested in him by constitutional or statutory grant. The extent and exercise of the Governor's powers under statute will depend upon the particular provisions thereof. . . ." Id. at 148, quoting with approval from 81 C.J.S. States, § 60 at 982. In Attorney General Opinion 77-191, the Attorney General was asked to determine whether the Oklahoma Water Resources Board could, by virtue of an executive order, establish and administer comprehensive rules and regulations on flood plain management. In holding the Governor's executive orders could not vest such power in the board, the Attorney General found that there was nothing in the Constitution which would remove the Governor from the general rule of law, laid down in Shaw v.Grumbine, 278 P. 311 (Okla. 1929). In that case, the Oklahoma Supreme Court, held in its syllabus that:
 Public officers have only such authority as is conferred upon them by law, and such authority must be exercised in the manner prescribed by law.
¶ 37 Speaking specifically of the Governor's power to issue executive orders, the Attorney General stated:
 In view of this holding [in Shaw v. Grumbine], it is significant that neither the Constitution nor the Statutes of Oklahoma expressly confer authority to issue Executive Orders carrying the force of law. This is not to infer from such silence the absence of authority to issue Executive Orders carrying the force of law. This is not to infer from such silence the absence of authority to issue Executive Orders. Certainly, the discharge of "supreme Executive power" entails the capacity to issue Executive Orders to accomplish sufficient administration within the Executive Branch. The prohibition goes to the issuance of Executive Orders intended to accomplish a legislative effect.
A.G. Opin. 77-191, p. 149.
¶ 38 In the case of the State Insurance Fund, it is the Commissioner of the Fund that is empowered to manage or conduct all the business affairs of the Fund, including the power to enter into contracts. Nowhere in the provisions of 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14] is the Governor authorized to control the contracting power of state agencies. Rather, that statute is specifically addressed and limited to procedures regarding State employees. The statute does not either expressly or by implication grant the Governor the power to interfere with the contracting powers of agencies, boards and commissions. Since an executive order may be used to enforce the law but not to make the law, the Governor, by issuing an executive order, may not exercise power not already vested in him by law. Accordingly, we conclude that the Governor does not have the power to issue an executive order prohibiting agencies, boards and commissions from entering into professional or personal service contracts.
¶ 39 It is, therefore, the official Opinion of the AttorneyGeneral that:
1. The Oklahoma State Insurance Fund, created and establishedat 85 O.S. 1991, § 131[85-131], is an "agency" of the State as thatterm is used in the Oklahoma Personnel Act, 74 O.S. 1991, §§840.1[74-840.1] to 841.24 and (as renumbered) in 74 O.S.Supp. 1994, §§840-1.1[74-840-1.1] to 840-6.9, and is subject to the "freeze in hiring"provided for at 74 O.S.Supp. 1994, § 840-2.14[74-840-2.14].
2. The Governor is not empowered, under the provisions of 74O.S. Supp. 1994, § 840-2.14[74-840-2.14], to issue executive orders freezingor limiting the power of State agencies, boards and commissionsto enter into professional or personal service contracts.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL
[1] This opinion was assigned two numbers "88-61 and 88-41"; throughout this Opinion we will refer to its higher number only.